UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CELESTE R. NIARCHOS, )<br>   Plaintiff, )<br>  )<br>   v. )<br>  )<br>CITY OF BEVERLY, et al., )<br>   Defendants. ) | Civil Action No. 08cv10747-NG |

GERTNER, D.J.:

**MEMORANDUM AND ORDER RE: DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**
July 7, 2011

This is a extraordinarily painful story, made even more painful by the fact that federal constitutional law is inadequate to address it. On the morning of May 18, 2005, Matthew Lewis ("Lewis") called police because his girlfriend Danielle Tarsook ("Danielle") had threatened to kill herself. Police officers went to her apartment, where Danielle agreed to allow the officers to take her to the hospital in an unmarked police car. Per Danielle's requests, one of the officers contacted Danielle's father, Dennis Tarsook ("Dennis"),[1] an on-duty police officer in the same town, and asked him to meet Danielle at the hospital. When Danielle and the officers arrived at the hospital, Dennis was already there, waiting outside the building. After watching Danielle and her father walk through the entrance into the main lobby, the officers left. Inside the hospital lobby, Dennis and Danielle spoke, then argued. Dennis left and drove away in his patrol car. Shortly thereafter, Danielle went back to her apartment, never having been admitted to the hospital. She committed suicide by hanging herself with an electric cord.

---

[1] First names are used here because multiple family members with the same last name are involved.

-1-

Plaintiff Celeste Niarchos ("Niarchos"), acting as the administratix of Danielle's estate, sued the City of Beverly ("the city") and police officers Richard Ganey ("Ganey"), David Richardson ("Richardson"), and John DiVincenzo ("DiVincenzo") (collectively "the defendants"). Pursuant to 42 U.S.C. § 1983, Niarchos claims that (1) the individual defendants were deliberately indifferent to Danielle's serious medical needs in violation of her Fourteenth Amendment due process rights; and (2) the city failed to train officers in the detection and implementation of rules and regulations to prevent suicide attempts, also in violation of Daneille's Fourteenth Amendment due process rights (collectively Count 1). In addition, Niarchos alleges that the defendants, by threats, intimidation, or coercion, deprived Danielle of her federal and state rights in violation of the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, §§ 11H, 11I (Count 2), and that the city negligently failed to prevent Danielle's suicide in violation of Mass. Gen. Laws ch. 258, § 2 (Count 3).

Defendants moved for summary judgment, arguing that: 1) they had not deprived Danielle of any federally protected right; 2) they were not deliberately indifferent or willfully blind to the risk that Danielle might harm herself; and 3) the city was immune to Danielle's claim of negligence pursuant to Mass. Gen. Laws ch. 258, § 10(j).

The outcome of ths case is determined by the Supreme Court 's decision in <u>DeShaney v. Winnebago County Department of Social Services</u>, 489 U.S. 189 (1989), a widely criticized

case,[2] and various opinions construing it. Since I am constrained by those opinions, I have no choice but to GRANT the defendants' Motion for Summary Judgment (document #38).

I.  **STANDARD OF REVIEW**

Summary judgment is appropriate when the record shows that there is no genuine issue of material fact. Fed. R. Civ. P. 56(c)(2). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," then the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The Court must take the facts in the light most favorable to the non-moving party and draw reasonable inferences in that party's favor. CMI Capital Mkt. Inv., LLC v. Gonzalez-Toro, 520 F.3d 58, 61 (1st Cir. 2008).

II. **BACKGROUND**

Taken in the light most favorable to Danielle, the facts surrounding her suicide are as follows:

**A.  Danielle's Background and Events Leading Up to Her Suicide**

---

[2] Perhaps the most telling criticism, with which this Court sympathizes, is that of Justice Blackmun, in dissent in DeShaney:

> Today the Court purports to be the dispassionate oracle of the law, unmoved by "natural sympathy." But in this pretense, the Court itself retreats into a sterile formalism which prevents it from recognizing either the facts of the case before it, or the legal norms that should apply to these facts.

DeShaney, 489 U.S. at 270. See Barbara E. Armacost, Affirmative Duties, Systematic Harms, and the Due Process Clause, 94 Mich. L. Rev. 982, 983 n. 8 (1996).

Danielle was born on December 19, 1985, to Beverly and Dennis Tarsook ("Beverly" and "Dennis"). Dennis was a sergeant for the Beverly Police Department ("BPD"). Def.'s Stmt. Of Undisputed Facts 2 (document #40) [hereinafter, Def.'s Stmt.].[3] Beverly and Dennis legally separated in 2001, and after lengthy litigation, finalized their divorce in 2005. Dennis Dep. 15:3-12, Sept. 22, 2008 (document #40-3). Danielle moved in with her father during her last year of high school, having previously resided at her mother's Beverly home with her older brother, Matthew. Danielle graduated from Beverly High School in 2004 and subsequently enrolled at the University of Massachusetts-Dartmouth. She withdrew from college in December of 2004 after her first semester, at which point Dennis secured an apartment for her at 28 Rear ("28R") Cabot Street in Beverly, for which he paid the monthly rent. Dennis Dep. 19:6-23:15. Soon after, Lewis, Danielle's boyfriend, moved into the apartment. The couple lived together until Danielle's death.

According to Dennis, Lewis, and Danielle's medical records, Danielle had a history of mental health issues. Dennis claims that the problem was Danielle's eating disorder, which was the only mental health problem he observed in his daughter. Dennis Dep. 26:15-18. Lewis portrays Danielle as emotionally troubled during the last months of her life, noting that before her hospitalization in April of 2005, Danielle not only ceased eating; she cried constantly. Lewis Aff. 4 (document #44-9). Danielle visited Beverly Hospital three times between April 20 and April 23, 2005, for problems related to anorexia. The emergency report from one such visit on April 22 explained that Danielle reported to have "been mildly depressed over the last 4

---

[3] The parties' statement of facts cover different aspects of the relevant background information. I cite defendants' statement of undisputed facts where the plaintiff has admitted the facts at issue. See Pl.'s Response to Defs.' Stmt. Of Undisputed Facts (document #43).

months," and "believes she has anorexia and needs help." Beverly Hospital Emergency Report, Exhibit R (document #44-10). After her third and final hospital visit on April 23, 2005, a nurse at Beverly Hospital – a wife of one of Dennis's coworkers – helped Danielle obtain treatment at Waltham Sterling Hospital. Dennis Dep. 25:12-26:11. Danielle entered inpatient care for anorexia nervosa at Walden Behavioral Care, a facility within the hospital, where she remained from April 23 until April 28. Walden Behavioral Care Discharge Summary, Exhibit T (document #44-12).

On the morning of her death, May 18, 2005, at around 8:30 a.m., Danielle unexpectedly showed up at Lewis' workplace, Aspen Cooling and Heating in Peabody, Massachusetts, appearing "upset, anxious, and angry." Lewis Aff. 6-7. Between 30 minutes and an hour after she left Lewis's work, Danielle called him crying, claiming that she was going to kill herself. Concerned about Danielle's safety, Lewis immediately called the police and spoke with Patrolman Daniel Skerry ("Skerry"), who was working as a dispatcher at the time.[4] Lewis told Skerry that his girlfriend had "just called and said she was going to kill herself and something needs to be done." Lewis Aff. 9.[5]

---

[4] Skerry's duties included answering calls and dispatching police officers to events as he deemed appropriate.

[5] Whether Lewis explicitly expressed concern during the 911 call that Danielle would harm herself is unclear. Lewis' affidavit is the only account of the call that mentions Danielle was threatening to kill herself. In his deposition, Skerry said, "I believe [Lewis] had just spoken to Danielle Tarsook and he requested that we send a patrol officer down to speak to her." Skerry Dep. 28:19-24, April 9, 2008 (document #40-7). Captain DiVincenzo similarly reported that Officer Skerry called him on a Nextel that morning and informed him that Danielle's "boyfriend had called the station and said he didn't think she would harm herself, but would we send a cruiser by to check on her." DiVincenzo Dep. 17:2-16, March 3, 2009 (document #40-4) [hereinafter, DiVincenzo Dep. (Part 1)]. The specific content of that call does not change the legal analysis, namely, the application of DeShaney to these facts.

### B. Police's Arrival at Danielle's Apartment

Skerry dispatched Patrolman Jason F. Lantych ("Lantych"), who was at the police station, to go down and "check on the well-being of [Danielle Tarsook]" at 28R Cabot Street. Lantych Dep. 28:19-24, April 6, 2009 (document #40-8). According to a Q sheet — a computer entry that a dispatcher initiates when a call comes into a station, which contains facts and brief comments[6] — that Lantych completed after the incident, he was "sent to 28R Cabot to check on [the] well-being of female party possibly wanting to harm herself." Incident Report, Exhibit H (document #40-9). Around the same time, DiVincenzo and Ganey also left the station and traveled to Danielle's place.

The reason that they went to Danielle's apartment remains unclear; DiVincenzo asserts that Skerry sent him, but Skerry says that he does not know how or why DiVincenzo was dispatched or who told DiVincenzo to go to the address. See DiVincenzo Dep. (Part 1), 10:14-20; Skerry Dep. 58:7-15. Ganey reports that DiVincenzo asked him for a ride and that he agreed without knowing the reason for the trip. Ganey Dep. 36:22-24, April 21, 2009 (document #40-6). According to Ganey, once in the car, DiVincenzo told him that he had been notified at the station of Danielle's boyfriend's call; however, he said that the brevity of the car ride did not allow for any further discussion. Ganey Dep. 33:20-22. At some point, DiVincenzo called Richardson, another officer, via Nextel and told him "to meet him at 28 Rear Cabot for an assist citizen call." Richardson Dep. 27:13-24, April 13, 2009 (document #40-5).

When Lantych arrived at Danielle's apartment, he parked his marked cruiser in the parking lot outside of Danielle's building. DiVincenzo and Ganey got to Danielle's place soon

---

[6] This is how DiVincenzo defined the Q sheet. See DiVincenzo Dep. (Part 1) 25:22-23.

thereafter and also parked in the lot. Richardson was the last to arrive, but soon after spotting the other two cars, he received a dispatch from DiVincenzo that "they were all set and to clear" from the area. Richardson Dep. 30: 15-21. Richardson left the parking lot almost immediately – within "maybe thirty to sixty seconds" – and returned to the office. Richardson Dep. 31:6-10.

Lantych, DiVincenzo, and Ganey went to Danielle's apartment, and DiVincenzo knocked on the door. Crying, Danielle opened the door.[7] Incident Report, Exhibit H. DiVincenzo began to talk with Danielle. Neither Lantych nor Ganey said a word directly to Danielle. DiVincenzo told Danielle that the officers would like her to go to the hospital in order to speak to staff and that an ambulance was waiting,[8] but Danielle refused to travel in an ambulance. DiVincenzo Dep. (Part 1) 17:16-18:3; see also Ganey Dep. 39:9-40:7. DiVincenzo then offered to drive Danielle to the hospital in an unmarked police cruiser instead, and Danielle agreed.[9]

---

[7] Lantych wrote in the Q sheet that Danielle was crying, a description he repeated in his deposition; however, DiVincenzo and Ganey have both challenged this claim. DiVincenzo asserts that Danielle appeared composed, calm, and very polite, while Ganey says that she appeared physically fine and was not crying. Lantych Dep. 29: 3-6; see also DiVincenzo Dep. (Part 1). 127:4-129:15 and Ganey Dep. 42:20-43:11.

[8] DiVincenzo asserts that, during his conversation with Danielle, he "was always under the assumption there was an ambulance standing by," believing "one was on the way or one was out there" already. DiVincenzo Dep. 21:18-34:19. In fact, there was no ambulance at Danielle's apartment. Skerry says that he does not remember having any discussions that day about dispatching an ambulance or actually sending one. Skerry Dep. 53:8-55:15. DiVincenzo does not recall why he thought an ambulance had been dispatched, and said that Skerry only told him explicitly that he had, in fact, dispatched an ambulance years later, after an article appeared in the news which reported that no ambulance was sent to Danielle's residence. DiVincenzo Dep. (Part 1), 21:18-22:5.

[9] DiVincenzo and Ganey both report that Danielle refused to take an ambulance but agreed to go in an unmarked car. DiVincenzo Dep. (Part 1), 34:13-38:11; see also Ganey Dep. 39:8-17. While Niarchos denied the version of the events described by the defendants in their Statement of Undisputed Material Facts, she offered no alternative. She specifically denied this statement: "Danielle Tarsook then agreed to go to the hospital and DiVincenzo, who believed there was an ambulance waiting outside, advised her of that belief; at that point, Danielle

DiVincenzo Dep (Part 1), 17:14-18:12. She requested that her father meet her at the hospital and asked DiVincenzo to make sure that Dennis would be waiting for them when they arrived. DiVincenzo Dep. 52:10-59:23, April 6, 2009 (document #44-4) [hereinafter, DiVincenzo Dep. (Part 2)]. In total, this encounter at the apartment lasted only a few minutes.

Along with DiVincenzo and Ganey, Danielle got into Ganey's vehicle and sat in the backseat for the duration of the ride. See Dennis Dep. 40:23-41:1. While in the car, DiVincenzo called Dennis via his Nextel and arranged for Dennis to meet the group at the hospital. Def.'s Stmt. 37.

### C. Summary of Events at Beverly Hospital

Dennis arrived at Beverly Hospital several minutes before the cruiser. At that time, he was on duty and in uniform. Upon arriving at the hospital, DiVincenzo and Ganey saw Dennis standing in front. While Ganey remained sitting inside the vehicle, DiVincenzo exited the car and opened the cruiser's backdoor for Danielle. Neither Ganey nor DiVincenzo walked or escorted Danielle into the hospital. Ganey Dep. 58:21-59:8. Rather, they watched Danielle greet her father outside the hospital entrance and walk into the hospital through an entryway that led to an "outside lobby" or "foyer" with Dennis. DiVincenzo Dep. (Part 1) 43:7-44:2; Dennis Dep. 43:24; see also Ganey Dep. 60:5-11. Ganey and DiVincenzo then left.

In the lobby area, Danielle and Dennis sat down on a bench and talked. Dennis recalls engaging in a conversation about Danielle's boyfriend, Lewis, and her apartment. Danielle

---

Tarsook became quite upset and advised that there was 'no way' she was going in an ambulance. See Exhibit C, pp.17-18. DiVincenzo countered by asking if she would be willing to go in an unmarked car; Danielle Tarsook agreed and asked if her father could meet her there." Def.'s Stmt, 36.

discussed being unable to afford her apartment since Lewis was planning to move out. Dennis told Danielle that, since he was paying for it anyway, she had no reason to leave. He also handed his daughter $100 for a bill that she had she mentioned. Dennis Dep. 42:5-44:22. At some point during their conversation inside the hospital, the two had an argument.[10] Massachusetts State Police Record of Investigation, Exhibit Z (document #44-18). Dennis walked out of the hospital through the doors leading outside, while Danielle walked through the opposite doorway toward the ER. Dennis got into his cruiser and resumed his job duties. Dennis Dep. 43:16- 44:10.

Danielle appears to have then exited the hospital and returned to her apartment at 28R Cabot. She never spoke with hospital staff or registered at the hospital. Sometime after returning home, she hung herself with an extension cord in her kitchen. Lewis discovered her when he got home from work at approximately 5:30 p.m. and immediately called the BPD. Lewis Aff. 10-11.

### D.     The Alteration of Beverly Police Records

Timothy Hegarty ("Hegarty") was the officer in charge for the BPD during May of 2005, and his duties included ensuring that accurate records were maintained at the station. On May 20, 2005, after having learned that Danielle had committed suicide, Hegarty changed the designation of the incident on the Q sheet from "assist citizen" to "medical-mental health" and "possible suicidal female." Incident Report, Exhibit H. He also contacted Lantych that day, advising him that he had not completed the comments entry of the Q sheet. Lantych wrote the

---

[10] Dennis was unable to remember this argument or its cause at his deposition. Dennis Dep. 47:14-48:2.

narrative section of the report – after Danielle's death -- using his recollection of his firsthand experience and observations at the apartment. Def.'s Stmt #50.

## III.   DISCUSSION

Niarchos raises three claims. She asserts under 42 U.S.C. § 1983 (Count 1) and the MCRA (Count 2) that defendants violated her constitutional and state rights. She further claims that the defendants were negligent in their care of Danielle (Count 3). I will address each in turn.

### A.   Fourteenth Amendment Due Process

Pursuant to 42 U.S.C. § 1983, Niarchos alleges that both the city and the individual defendants violated Danielle's right to substantive due process when they deprived her of essential mental health care and, as a result, her life, by releasing her to her father's care instead of admitting her to the hospital. In order to prevail on a §1983 claim, Niarchos must show that the individual defendants 1) deprived Danielle of a federally protected right; and 2) were acting under the color of state law. See 42 U.S.C. § 1983; West v. Atkins, 487 U.S. 42, 48 (1988); Velez-Rivera v. Agosto-Alicea, 437 F.3d 145, 151-52 (1st Cir. 2006). Additionally, in order to establish municipal liability, Niarchos must also show that the deprivation of Danielle's federally protected right was attributable to a municipal custom or policy. Monell v. Dep't of Soc. Serv., 436 U.S. 658, 694 (1978); Kelley v. LaForce, 288 F.3d 1, 9 (1st Cir. 2002).

Under what has come to be known as the DeShaney doctrine, Niarchos simply had no substantive due process right to affirmative care by the defendants. As such, the defendants did not deprive Danielle of a federally protected right. See DeShaney v. Winnebago Cnty. Dep't of Soc. Serv., 489 U.S. 189, 195 (1989).

In <u>DeShaney</u>, the Supreme Court held that state actors generally have no affirmative constitutional obligation to protect citizens from harm caused by private parties. 489 U.S. at 195-97 (1989). Six members of the Court found that four year old Joshua DeShaney was not entitled to relief on tragic facts. Joshua was so badly abused that nearly half of his brain tissue was destroyed; at the time of the litigation, he was severely mentally handicapped. His attorney claimed that the county officials who stood by and documented fourteen months of violent abuse to him, without taking any steps to intervene or to obtain medical attention on his behalf, deprived him of liberty under the due process clause of the Fourteenth Amendment. The Court held that a proper interpretation of the due process clause precluded Joshua's action. At the close of the opinion, the majority noted that "judges and lawyers, like other humans, are moved by natural sympathy in a case like this to find a way for Joshua and his mother to receive adequate compensation for the grievous harm inflicted upon them." <u>DeShaney</u>, 409 U.S. at 202-03. Yet the Court resolved that, rather than yielding to that "impulse" of sympathy, it should stand by its view of what the correct interpretation of the Constitution involved.

To be sure, the Court did recognize an exception to the <u>DeShaney</u> rule. State actors have an affirmative "duty to protect" a person in "limited circumstances," including those where the state has incarcerated or involuntarily institutionalized the person. <u>Id.</u> at 199-200. The <u>DeShaney</u> exception has been applied 1) based on allegations that the plaintiff was in the functional custody of the state or in instances 2) in which the state created or increased the danger to which the plaintiff was exposed. <u>See, e.g.</u>, <u>J.R. v. Gloria</u>, 593 F.3d 73, 79 (1st Cir. 2010); <u>Breen v. Tex. A&M Univ.</u>, 485 F.3d 325, 333-37 (5th Cir. 2007); <u>Pena v. DePrisco</u>, 432 F.3d 98, 108 (2d Cir. 2005). Niarchos claims that Danielle was in the state's functional custody

-11-

and, hence, the defendants had a duty to protect her. This contention, however, is not really supported by the facts, and more importantly, runs contrary to prevailing law.

As defined by the Supreme Court in DeShaney, custody is the result of "the State's affirmative act of restraining the individual's freedom to act on his own behalf." 489 U.S. at 200. The First Circuit describes functional custody as "situations where a state creates a 'special relationship' because of 'the limitation which [the state] has imposed on [an individual's] freedom to act on his own behalf,'" J.R., 593 F.3d at 79 (quoting Rivera v. Rhode Island, 402 F.3d 27, 34 (1st Cir. 2005) (quoting DeShaney, 489 U.S. at 200)).

The functional custody requirement can typically be satisfied through arrest, incarceration, or institutionalization. See DeShaney, 489 U.S. at 199-200. In addition, the majority of circuit courts have recognized a constitutional right to protection from unnecessary harm for children involuntarily placed by the state in foster care. Nicini v. Morra, 212 F.3d 798, 808 (3d Cir. 2000); Walton v. Alexander, 44 F.3d 1297, 1304 (5th Cir. 1995); Camp v. Gregory, 67 F.3d 1286, 1297 (7th Cir. 1995); Lintz v. Skipski, 25 F.3d 304, 305 (6th Cir. 1994); Norfleet v. Ark. Dep't of Human Servs., 989 F.2d 289, 293 (8th Cir. 1993).

Courts have generally been hesitant to push the boundaries of "functional custody" much further than arrest, incarceration, institutionalization or foster care. For instance, several circuit courts have rejected arguments that public schoolchildren, by virtue of compulsory attendance laws, are in the functional custody of the state during school hours. See, e.g., Hasenfus v. LaJeunesse, 175 F.3d 68, 73-74 (1st Cir. 1999); Doe v. Claiborne Cnty., 103 F.3d 495, 510 (6th Cir. 1996). Courts have likewise rejected the notion that individuals in public housing or employees of a public entity are in the functional custody of the state. See, e.g., Wallace v.

Adkins, 115 F.3d 427, 430 (7th Cir. 1997); Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 276 (10th Cir. 1996); Dawson v. Milwaukee Hous. Auth., 930 F.2d 1283, 1285 (7th Cir. 1991).

Indeed, some courts have even suggested that arrest, incarceration, and institutionalization are not always functional custody. For instance, the Fifth Circuit has held that "the state creates a 'special relationship' with a person only when the person is *involuntarily* taken into state custody and held against his will through the affirmative power of the state." Walton, 44 F.3d at 1304 (emphasis added). Similarly, the Seventh Circuit has suggested that custody under DeShaney entails more than a "simple criminal arrest." Estate of Stevens v. City of Green Bay, 105 F.3d 1169, 1175 (7th Cir. 1997).

In the context of suicide cases, courts, including the First Circuit, have declined to impose on police officers or other state actors a constitutional duty to protect a victim where the victim was not under arrest, incarcerated, or institutionalized. In Monahan v. Dorchester Counseling Ctr. Inc., the First Circuit found that a state official had no constitutional duty to protect a mentally ill individual, Kevin Monahan ("Monahan"), whom the official knew had attempted to voluntarily commit himself to a treatment center. 961 F.2d 987, 988 (1st Cir. 1992). After Monahan experienced a panic attack, an employee from the Department of Mental Health drove Monahan to a crisis intervention facility, but the facility would not admit him. Id. at 989. During the trip back to the treatment center, Monahan jumped out of the van and began walking down a highway off-ramp. Id. The driver continued to the intervention center; in the meantime, a car struck and injured Monahan. Id. The court held that no constitutional violation had occurred on the grounds that the Department of Mental Health employee did not owe a duty to protect Monahan because he had not been involuntarily committed. Id. at 992, 994.

In Hasenfus v. LaJeunesse, the First Circuit again refused to expand the pool of suicide victims protected by a constitutional right to affirmative state protection. 175 F.3d 68, 71 (1st Cir. 1999). The court found that school officials do not have a due process duty to protect students from attempting suicide, and like courts elsewhere (described above), rejected plaintiff's plea to adopt a general rule that, with respect to a constitutional duty to protect, school children are similar to prisoners and patients "because school attendance is compulsory and because in some measure the school authorities act *in loco parentis*." Id.

Likewise, in Collignon v. Milwaukee Cnty., a case with facts akin to those here, the father and stepmother of a suicidal 28-year-old reported that their son was missing. 163 F.3d 982, 986 (7th Cir. 1998). Upon finding the son, officers picked him up and then released him to his father and stepmother about an hour and a half later. Id. The son committed suicide on the following day. Id. The Seventh Circuit declined to find that the officers violated the individual's due process rights in part because the son was not a pretrial detainee. Id. at 993. The court explained:

> [W]hen the state restrains an individual's ability to seek necessary aid, it must provide that aid itself. The Shorewood police did not restrain Jonathan's ability to get private aid; indeed they improved his ability to do so by preventing him from wandering the streets in the middle of the night and releasing him to his parents. The plaintiffs are trying to expand the rule that the state must provide medical treatment to pre-trial detainees into a rule imposing an obligation to provide medical treatment whenever the police interact with a person who turns out to have a chronic mental illness, no matter how brief that interaction. When the Shorewood police temporarily took Jonathan into custody, he was clearly not a pre-trial detainee.

Id.

Similarly, in Shoenfield v. City of Toledo, police temporarily detained an individual in a parking lot after receiving a report that he was apparently intoxicated, had blood on his hands,

-14-

and had tried to buy a gun. 223 F. Supp. 2d 925, 927 (N.D. Ohio 2002). The police released the individual about an hour later when they determined that he had not committed any crimes. Id. A few hours after that, the individual bought a gun from a different store and killed himself in a hotel room. Id. at 928. The court held that the police could not be liable because the individual was never in custody. Id. at 930.

In one notable case, however, this Court has found that state officials violated their constitutional duty to protect individuals from killing themselves in a situation where the victim was not under arrest, incarcerated, or institutionalized, but in the state's protective custody. In Ringuette v. City of Fall River, a severely intoxicated individual suffered serious injuries while in protective custody when police neglected to feed him, give him water, or monitor him closely. 888 F. Supp. 258, 261-62 (D. Mass. 1995). The police found Roger Ringuette ("Ringuette") slumped over a parked car in an extremely drunken state. Id. at 261. When offered a ride home by the police, Ringuette responded "my brother." Id. Not sure what to make of this response, officers took Ringuette into protective custody and placed him at a detox facility run by Stanley Street Treatment & Resource, Inc., pursuant to the Massachusetts Alcoholism Treatment and Rehabilitation Act. Id.; see Mass. Gen. Laws ch. 111B, § 8.

While in protective custody, Ringuette was not given food or water in contravention of the treatment center's rules and regulations. Id. at 262. Ringuette was incoherent and incapacitated throughout his time at the facility. Id. At around 6:00 p.m., over twenty-four hours after Ringuette had initially been admitted, officers noticed something was wrong. Id. Emergency medical technicians discovered Ringuette had gone into shock while lying on the floor, surrounded in a pool of vomit. Id. His left hand, forearm and abdomen were burned. Id.

After being taken to the hospital, the doctors discovered Ringuette had overdosed on drugs, was severely dehydrated, and was suffering from untreated first and second degree burns. Id.

Noting that there was an open question "whether a person incapable of consenting or not consenting" may make out a substantive due process claim under § 1983, this Court held that "the state has a duty under the constitution to protect persons who are taken into protective custody because of incapacitation and who lack the capacity to give knowing, intelligent and voluntary consent to protective custody." Id. at 268.

In Coscia v. Town of Pembroke, applying this body of law,[11] I found that the police had a duty to protect the plaintiff because he had been formally arrested and while in custody, threatened suicide and indeed, made several attempts. 715 F. Supp. 2d 212, 218 (D. Mass 2010). Coscia's arrest had followed a single car accident. Id. While detained in police custody, he licked an electrical outlet, and threw his body against various walls. Id. The police officer's suicide evaluation form listed him as "a very high risk" of suicide. Id. Significantly, Coscia told officers he planned on jumping in front of a train. Id. Notwithstanding the threats, the police

---

[11] This court distinguished the case from Monahan, emphasizing that the First Circuit in Monahan dealt with voluntary civil commitment. Ringuette, 888 F. Supp. at 267. The court said: "Monahan was a voluntarily committed mental patient, with a known history of jumping out of moving vehicles, who claimed that the state was constitutionally obliged to take precautions that would have prevented him from jumping out of a state van while being transported from one state facility to another." Id. Conversely, the court said, "Ringuette was either unconscious, like the plaintiff in Garcia, or so incapacitated as to be incapable of volition, like those in Merideth and Buffington" putting into serious question whether Ringuette had been able to give consent and, therefore, involuntarily placed into custody. Id. at 268; see e.g. Garcia v. Salt Lake City, 768 F.2d 303, 308 (10th Cir. 1985) (finding a county liable for a § 1983 violation for failing to adequately monitor a person who was admitted to jail while unconscious and suspected of being drunk); Merideth v. Grogan, 812 F. Supp. 1223, 1230 (N.D. Ga. 1992) (holding a drunken, suicidal person, admitted to jail for his own protection at the request of his family, was entitled to due process protections).

simply released him.  Id.  Shortly afterwards, Coscia did what he had threatened, committing suicide by walking in front of a train.  Id.

In the instant case, Danielle was not arrested, incarcerated, or institutionalized.  Nor did the police exert physical force on her.  Rather, unlike the deceased in Ringuette, who was placed in protective custody without his clear consent, Danielle voluntarily got into an unmarked police car with colleagues of her father's, after she had refused to ride in an ambulance.  While she may have felt pressure to let the officers take her to the hospital – three officers were encouraging her to seek medical assistance – she did not physically resist or even verbally refuse to go.[12]  Instead, she requested that the police ask her father to meet her at the hospital.

While this case is extraordinarily tragic on so many levels, I cannot ascribe legal responsibility to the defendants.  The law is simply otherwise.  I must find that the police did not restrain Danielle's "freedom to act on h[er] own behalf," DeShaney, 489 U.S. at 200, and, hence, Danielle was not in the state's custody.  Therefore, Danielle had no constitutional right to the state's protection.[13]

### B.   MCRA and Negligence

---

[12] Niarchos has not shown – even assuming facts and inferences in Niarchos' favor – that Danielle's mental state rendered her unable to give consent.

[13] I draw this conclusion as a matter of federal constitutional law, which imposes a relatively high standard for liability.  I note that there was evidence that the BPD violated their own regulations and policies which provided that family members were not to respond to incidents involving other family members. I also note that these regulations and policies which derived from a previous high profile case in which the son of a Beverly police dispatcher murdered his girlfriend and then committed suicide.  The dispatcher had received the call from his son, and simply directed him to get out of the house.  The problem is that evidence of the violation of state policies is simply not enough under these circumstances to establish a violation of a federal constitutional right.

Niarchos also claims that the individual defendants deprived Danielle of her liberty and her right to substantive due process by use of threats, intimidation and coercion, in violation of the MCRA, which provides for a cause of action "[w]henever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons *of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth*." Mass. Gen. Laws ch. 12, §§ 11H-11I (emphasis added). In addition, Niarchos brings a negligence claim against the city pursuant to Mass. Gen. Laws ch. 258, § 2, which provides that a public employer may be liable for "personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment." .

I have jurisdiction over these state claims only through pendent claim jurisdiction. Pendent jurisdiction is involved when, as here, a plaintiff seeks to join a non federal claim to a federal one. The non-federal claim is one in which there is no independent basis for federal subject matter jurisdiction. Without the federal claim, I decline to consider the state claims.[14]

## II.    CONCLUSION

For the foregoing reasons, defendants' Motions for Summary Judgment (**document # 38**) is **GRANTED**.

---

[14] In any event, to the extent that the state MCRA claims track the requirements of § 1983, Batchelder v. Allied Stores Corp., 393 Mass. 819, 823 (1985)(explaining that the MCRA is meant to be coextensive with § 1983, except that the federal statute requires state action, and the MCRA has an additional requirement of "threats, intimidation and coercion.") the litigation would be futile. To the extent that the negligence claims do not track § 1983, they are problematic in the light of the statutory public duty rule, Mass. Gen. Laws ch. 258, § 10(j) which seems to immunize the municipality from liability.

**SO ORDERED.**

**Date: July 7, 2011**          /s/ Nancy Gertner
                                **NANCY GERTNER, U.S.D.J.**